UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FERNANDO CHIRENO, | Civil Action No. 20-651 (FLW) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| DR. LIEBERMAN, et al., | |
| Defendants. | |

Plaintiff Fernando Chireno has filed a counseled motion for a preliminary injunction seeking to halt the administration of forcible psychotropic medication until he can be evaluated by an independent psychiatrist. ECF No. 66. He is also seeking injunctive relief to require New Jersey State Prison officials to provide him with the procedural protections outlined in N.J.A.C. §10A:16-11.4, including the right to competent layperson assistance. For the reasons explained below, the Court will defer decision on the motion for preliminary injunction and authorize the parties to conduct expedited discovery on the relevant factual and legal issues.

I.  **Relevant Factual Background and Procedural History**

After being convicted of numerous offenses, including the murder of his wife, Plaintiff was sentenced to life in prison. (MHR 03177).[1] The record reflects that Plaintiff attempted suicide in 2008. On the date of his arrest, April 18, 2008, Chireno was transported to Saint

---

[1] Unless otherwise noted, the citations are to the Certification of Jordan S. Goldsmith, Esq. (Goldsmith Cert.). Specifically, Exhibit A contains Plaintiff's mental health records from New Jersey State Prison ("MHR"), Exhibit B contains Plaintiff's treatment review committee records from New Jersey State Prison ("TRC Records"), and Exhibit C contains Plaintiff's disciplinary records from New Jersey State Prison ("Discipline Records").

1

Mary's Hospital from the Passaic County Jail for evaluation after allegedly attempting to hang himself. (MHR 03179). He was quickly sent back to the jail, however, after he denied any suicidal ideations, and was reported as not presenting as "psychotic." (MHR 03179). His diagnostic impression at the time was "R/O Malingering and R/O Antisocial Personality Disorder." (MHR 03179). His immediate history thereafter includes a hospitalization at Ann Klein Forensic Center, from August 25, 2010 to February 7, 2011, due to self-reports of depression, paranoid thoughts, and hallucinations. (MHR 03179).

After Chireno's conviction and sentencing on October 12, 2010, he was transferred to New Jersey State Prison (the "Prison") and specifically to the stabilization unit. (MHR 03180). While there, he reported experiencing hallucinations, paranoid thoughts, and self-reported a history of suicide attempts as a teenager. (MHR 03180). During his subsequent transfers to various specialty units within the Prison, Chireno continued to report similar experiences of hallucinations and paranoia. (MHR 03180). His treatment team suspected that some or perhaps all of his behavior and statements were due to malingering for secondary gain, however. (MHR 03180). For example, Chireno purportedly stated that he preferred the conditions in the stabilization unit due to it being air conditioned, providing him with a larger cell and hot showers. (MHR 03180).

Despite the signs of malingering and Chireno's own statements to that effect, (MHR 03177-03185), the mental health practitioners at the Prison began prescribing psychotropic medication for him in 2011 at the time of his admission to New Jersey State Prison. This continued unabated until June of 2014, after Chireno stated to a clinician that he had been noncompliant with his medication for close to a year. (MHR 03180). He was then transferred

2

out of the specialized unit on June 3, 2014 and sent to a general population unit, where after only a few weeks, he again reported "psychotic symptoms." (MHR 03180).

He then subsequently transferred back to the stabilization unit and on September 5, 2014, was administered a comprehensive mental health evaluation involving the utilizations of objective testing. (MHR 03177-03185). The findings of the evaluation revealed that Chireno may have a Cluster B Personality Disorder, but it appears that invalid test results prevented any definitive diagnosis of psychotic disorder NOS ("Not Otherwise Specified") and reflected an individual who was at least partially malingering. (MHR 03183). The author of the evaluation stated that "Chireno has revised his reports of psychotic symptoms several times creating a mysterious diagnostic impression." (MHR 03182). Despite an apparent confusion as to Chireno's true mental state, prison officials decided to continue Chireno on psychotropic medications. (MHR 03183).

Three and half years later, on April 25, 2018, after Chireno affirmatively and repeatedly expressed a desire to discontinue the medication, questions were raised as to his voluntary compliance with their administration, and prison officials decided to forcibly administer the psychotropic medication. (MHR 4432). Plaintiff contends that no consideration has been given to the severe adverse effects of the medication, as reported by Chireno, including excessive weight gain, blood in his stool, and hormonal changes which have resulted in the development of "female breasts." (TRC 110). It appears undisputed that since 2018, Chireno has had his psychotropic medications forcibly administered.

According to the most recent records, Chireno is currently being prescribed two psychotropic drugs: Fluphenazine Decanoate and Benztropine. (TRC109; MHR 06202-03). According to the TRC, these side effects include Extrapyramidal side effects ("EPS"), Tardive

Dyskinesia ("TD"), Neuroleptic malignant syndrome ("NMS), heat intolerance, anticholinergic side effects, injection site reaction including bleeding, sedation, dizziness, constipation and confusion. (TRC 109). EPS and TD are disorders resulting in involuntary movements, while NMS is a life-threatening reaction to certain psychotropic medications.[2]

On January 17, 2020, Chireno filed a Complaint asserting that the forcible administration of psychotropic drugs violates his civil rights pursuant to 42 U.S.C. § 1983. *See* ECF No. 1. Chireno alleged that he did not present a danger to himself or others, as required for forcible medication, and thus there is no medical justification for this current form of treatment. *See* ECF No. 1.

Chireno named as defendants Drs. Jordan Lieberman and Jonathan Riley, as well as Administrator Amy Emrich and Barry Kautzer. *See* ECF No. 1. Chireno claimed that these individuals were responsible, based on their roles with the TRC, for the decision to continue his forced psychotropic medication. *See* ECF No. 1.

Through the screening process pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court dismissed Defendant Kautzer <u>without prejudice</u>, and further dismissed <u>with prejudice</u> the official capacity claims for damages against all state defendants. *See* ECF No. 49.

On October 15, 2020, Mr. Chireno filed an Amended Complaint seeking similar relief as in his Original Complaint but endeavoring to add as new parties the New Jersey Department of Corrections ("NJDOC"), Rutgers Health, Administrator Bruce Davis, Assistant Superintendent Garyn Nathan, Rebeca Santiago, and Dr. Trevor Rudge. *See* ECF No. 7.

---

[2]*See* National Institutes of Health, U.S. National Library of Medicine, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=f8ba014e-aea0-49bc-8345-4e0a384b484e (last visited September 14, 2022).

On September 21, 2021, the Honorable Tonianne J. Bongiovanni, U.S.M.J., granted Chireno a limited appointment of pro bono counsel, to the extent that one could be found. *See* ECF No. 35. Specifically, representation by counsel would be for the limited purpose of assessing whether a temporary restraining order, or similar relief, is merited and to review Chireno's request for discovery.

Notices of Appearance were submitted on September 30, 2021, by Peter S. Pearlman, Esq., and Jordan S. Goldsmith, Esq., of the law firm of Cohn Lifland Pearlman Herrmann & Knopf LLP. *See* ECF Nos. 37 and 38.

On December 14, 2021, and then on December 19, 2021, the Defendant NJDOC served discovery responses in form of the TRC records, Chireno's Disciplinary Records, among others. On January 27, 2022, Defendant NJDOC served nearly 9,000 pages of complex medical and mental health records. Both of which were subject to a Discovery Confidentiality Order ("DCO") signed by Judge Bongiovanni on January 24, 2022. *See* ECF No. 43.

On March 15, 2022, this Court resolved a motion to dismiss and issued a screening Order which, among other things, dismissed <u>with prejudice</u> Defendant NJDOC and dismissed <u>without prejudice</u> Defendants Mr. Kautzer, Ms. Santiago, Mr. Davis, Dr. Rudge and Rutgers Health. *See* ECF No. 49. Mr. Chireno's Fourteenth Amendment claims regarding forced medication, brought pursuant to 42 U.S.C. § 1983, were permitted to proceed against Ms. Emrich, Mr. Nathan ("DOC Defendants"), and Drs. Lieberman and Riley ("Medical Defendants").

In response to the Judge Bongiovanni's September 21, 2021 Order, appointed counsel has moved for a preliminary injunction. ECF No. 66.

I.  **LEGAL STANDARD & ANALYSIS**

Among other relief, Plaintiff is seeking a preliminary injunction to halt the administration of psychotropic medication until he is independently evaluated to determine whether he needs psychotropic medication. "A plaintiff seeking a preliminary injunction must establish [ (1) ] that he is likely to succeed on the merits, [ (2) ] that he is likely to suffer irreparable harm in the absence of preliminary relief, [ (3) ] that the balance of equities tips in his favor, and [ (4) ] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because Plaintiff is a prisoner subject to the PLRA, any relief provided must be narrowly tailored. Specifically, under the PLRA, a district court cannot "grant or approve any prospective relief" respecting prison conditions "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Moreover, preliminary injunctive relief also automatically expires "90 days after its entry, unless the court makes the findings required under subsection (a)(1) ... and makes the order final...." 18 U.S.C. § 3626(a)(2); *Victory v. Berks Cnty.*, 789 F. App'x. 328, 332–33 (3d Cir. 2019). The parties do not address the impact of the PLRA on granting injunctive relief.

The Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210 (1990) governs the merits of Plaintiff's substantive and procedural due process claims challenging his forcible medication.[3] There, a Washington State regulation allowed for the involuntary medication of a convicted offender when "the mentally ill inmate [was] 'gravely disabled' or ... present[ed] a

---

[3] The Medical Defendants appear to rely on the more familiar deliberate indifference standard, which applies to inadequate medical care claims, but, as Plaintiff and the DOC Defendants recognize, *Harper* is plainly the governing standard.

'serious likelihood of harm' to himself or others ...." *Id.* at 220. In affirming the regulation against a due process challenge, the Court recognized that Harper had a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221-22 (citing *Vitek v. Jones*, 445 U.S. 480, 491-94 (1980); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *Parham v. J.R.*, 442 U.S. 584, 600-01 (1979)). The Court observed that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229 (citing *Winston v. Lee*, 470 U.S. 753 (1985); *Schmerber v. California*, 384 U.S. 757, 772, (1966)). After considering the competing individual and State interests, the Court held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227 (emphasis added).

The Supreme Court further opined that mental illness coupled with dangerousness "is a necessary condition to medication, but not a sufficient condition." *Id.* at 223, n.8 As explained by the Seventh Circuit in *Sullivan v. Flannigan*, 8 F.3d 591, 598 (7th Cir. 1993):

> *Harper* emphasized several [additional] aspects of an inmate's right to refuse drug treatment. First, to administer involuntary treatment the state must find that medication is in the prisoner's medical interest (independent of institutional concerns). 494 U.S. at 227. Second, the tribunal or panel that reviews a treating physician's decision to prescribe forced medication must exercise impartial and independent judgment, taking account of the inmate's best interest. *Id.* at 222, 233, 110 S.Ct. at 1036, 1042; *compare id.* at 250–253 (Stevens, J., dissenting). Third, the prisoner must be able to argue capably before a review tribunal that he does not need forced medication. *Id.* at 233. If the state failed to meet these requirements in a particular case, the prisoner could argue that he was denied *Harper's* protections.

7

*Id.*[4]

In *Harper*, the Supreme Court found that the procedures under the Washington regulation afforded the inmate adequate procedural due process. *Id.* at 228. *Harper* upheld a procedural system under which a prisoner:

> must be given at least 24 hours' notice of the Center's intent to convene an involuntary medication hearing, during which time he may not be medicated. In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary. At the hearing, the inmate has the right to attend; to present evidence, including witnesses; to cross-examine staff witnesses; and to the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved.

*Id.* at 216.

Subsequent Supreme Court decisions have reaffirmed the standard announced in *Harper*. *See, e.g., Riggins v. Nevada*, 504 U.S. 127, 134–35 (1992) ("Taking account of the unique circumstances of penal confinement," a mentally ill inmate may be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." (citing *Id.* at 227); *Sell v. United States*, 539 U.S. 166, 181-182 (2003) (reaffirming that the relevant inquiry is "whether

---

[4] The Third Circuit decided *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990) four days before *Harper*. There, the Third Circuit relied on *Turner v. Safley*, 482 U.S. 78 (1987) and held that prisoners have a limited right to refuse medical treatment to the extent the refusal is not inconsistent with legitimate penological interests, as well as "a related right to be informed of the proposed treatment and viable alternatives." *See id.* The Third Circuit analogized to decisions in the context of civil commitment, and held that the judgment of prison officials is presumed valid unless the decision "is shown to be such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* Plaintiff has raised serious concerns about the prison officials decisions to forcibly medicate him under either standard.

involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, ... to [mitigate] the individual's dangerousness).

Chireno is <u>not</u> challenging the constitutionality of the New Jersey regulations governing the administration of forcible medication, which are similar to the regulations reviewed in *Harper*.[5] *See Santos v. Bush*, 874 F.Supp.2d 408, 426 (D.N.J. 2012) (finding that New Jersey's regulations meet both substantive and procedural due process requirements). Instead, he challenges treatment review committees' decisions to continue his forcible medication, citing a lack of reliable evidence in his mental health records that he is dangerous to himself or others, the lack of a reliable psychiatric diagnosis which would warrant forcible medication, and the failure of the Treatment Review Committee's to conduct independent reviews of the prescribing doctor's decisions to forcibly medicate him or verify his mental health history.

At issue is whether prison officials have provided Plaintiff the substantive and procedural due process protections outlined in *Harper*. Most notably, Plaintiff's forcefully argues that the available Mental Health Records show that the continuation of forcible medication is occurring without adequate <u>independent</u> review by the prescribing physician and the Treatment Review Committee members or verification of Plaintiff's underlying mental health information:

> A review of the records reveals that, rather than being objective independent assessments based on an examination done on the date noted, they are rubber stamp replicas of each other, relying uniformly on the preceding assessments, which in turn, are based on the assessments done at the time of his initial incarceration in 2011. This clearly calls into question whether Mr. Chireno is truly being independently assessed on each evaluation or whether the practitioner's conclusions are preordained and supports an evaluation [by an] independent outside qualified mental healthcare provider. Moreover, an analysis of those early records, upon which all further evaluations that follow are derived, demonstrates a lack

---

[5] The DOC Defendants appear to assume that Plaintiff's forcible medication claim fails because the regulations themselves are constitutional.

9

> of any independent verification of the data, and serious inconsistencies in the accounting of Mr. Chireno's mental health history. The result is that since Mr. Chireno's admission on February 7, 2011, very little has been done to verify his true mental status, and indeed the only comprehensive assessment done stated that Mr. Chireno had a mere Cluster B Personality Disorder. (MHR 03183). It further stated that while there was a lack of objective data to confirm a diagnosis of psychotic disorder NOS, there was evidence to support a diagnosis of malingering. (MHR 03183). Again, nothing objectively supports the administration of this medication.
>
> These circumstances demonstrate that Mr. Chireno's mental healthcare providers have failed to evaluate his mental status for purposes of reaching a true diagnosis and lack the interest to do so. The fact that the assessment pattern noted above has existed for over ten years further supports a contention that they lack the initiative to change their evaluative practices. Mr. Chireno deserves an independent and objective outside evaluation of his mental status, so that finally after a decade of incarceration a definitive diagnosis can be made.

Plaintiff's Moving Brief at 11-12.

Plaintiff contends that the central basis for forcibly medicating him is his purported history of suicide attempts and argues that his Mental Health Records show a lack of suicide attempts other than the suicide attempt shortly after Plaintiff killed his wife in 2008. Shortly after his admission to the Prison in March of 2011, a "Brief History of Mental Health Treatment" was documented by one of the Prison's mental health practitioners. (MHR 02473). During the periodic assessments of his mental health, his "history" of suicide is repeated verbatim. (*See* MHR00565, July 25, 2012, assessment; MHR02815 October 28, 2014, assessment; MHR05764, April 29, 2015, assessment; MHR05040, November 11, 2016, assessment; MHR04850, May 23, 2017, assessment; MHR 04650, December 19, 2017, assessment; MHR04257, December 10, 2018 assessment; MHR 06503, December 7, 2020 assessment; MHR06261, June 9, 2021 assessment). The TRC records also rely on this past history as justification for the continued forced administration of psychotropic medication.

Plaintiff contends that his mental health records indicate that his last <u>attempt</u> at suicide was on April 18, 2008, the same date as his arrest for murder. (MHR03179). Plaintiff contends that his self-reported mental health status is the primary source for defendants' conclusion that he had any history of engaging in attempts at suicide prior to 2008.[6] (MHR03180; 01328, January 6, 2012, assessment). Plaintiff explains that the veracity of his early statements on this subject is questionable considering that these statements were originally made prior to his sentencing for murder, and when he was asserting a defense of insanity at trial. (MHR03179). Since then, he has repeatedly recanted those statements, insisting that he had made those statements for personal advantage, either for asserting arguments at his murder trial or obtaining better conditions at the Prison. (MHR 03180, 04432). Plaintiff calls attention to the fact that practitioners have repeatedly noted his tendency for manipulation and a proclivity to malinger symptoms when it suits his interests. (MHR 03181, 06567).

Plaintiff also purportedly has a history of threatening suicide, but the parties disagree about the number of suicide <u>threats</u> Plaintiff has made in Prison. Plaintiff contends that his mental health records, which span more than 10 years, show only a single threat to commit suicide in January 2018. (MHR 4581, TRC Records 028). In that instance, the Mental Health Records provide that Chireno allegedly self-reported to a Prison mental healthcare provider that he wanted to kill himself.[7] (MHR 04581). Chireno also points out that the Mental Health

---

[6] Plaintiff also contends that his self-reported history is contradicted by statements from practitioners that Plaintiff's mother has denied that her son has any history of suicide attempts, and that the incidents described as occurring in his past were mere threats. (TRC Records 028; MHR 02473, March 9, 2011, assessment; MHR 06503, December 7, 2020, assessment). The summaries from Plaintiff's psychiatrist in the Dominican Republic suspected that Mr. Chireno may have been suffering from depression and attention deficit disorder. (MHR 03178).

[7] The DOC Defendants cite to a different alleged suicide "threat" by Plaintiff in July 2018. (*See* Def. State Opp. at 15; citing Cert. Rodriguez, Ex. B). In this incident, Plaintiff stated "I would rather hang up or jump off the tier than take medication." (Ex. B at 4348). As pointed out by

11

Records themselves are devoid of any reported attempts at suicide during the 11 months when he was not taking anti-psychotics voluntarily. (MHR 03180, noting that he was not taking his medication from July 2013 through June 2014); (TRC Records 012, 028).

Medical Defendants Riley and Lieberman counter that Plaintiff's condition deteriorated rapidly in 2014, after the cessation of forcible medication; this deterioration including a psychotic episode where he "threatened to jump from the second tier" of the prison. (MHR 03181). Plaintiff contends in his Reply Brief that this suicide threat, which is mentioned in Plaintiff's 2014 mental health evaluation, is not substantiated by Plaintiff's actual Mental Health Records. Plaintiff argues that his mental health records show that as recently as 2021, Plaintiff was assessed as not demonstrating any current suicidal attempts at self-injurious behavior. (MHR at 6230).

Plaintiff also contests that he has a substantial history of violent behavior toward others, which prison officials also cite as a basis for continuing his forced medication. (*See* TRC Records 029). Plaintiff contends this alleged history of violence in prison is minor at best. Plaintiff's currently available disciplinary records reveal only one incident in which Mr. Chireno exhibited "violent" behavior toward others. (Discipline Records 065). In that incident, Chireno was observed fighting with another inmate, both individuals stopped when directed by the officer, and both suffered only scratches. (Discipline Records 065). In response to the question of whether Mr. Chireno's "mental illness contribute[d] to the behavior manifesting itself in the alleged infraction?" the answer was "no." (Discipline Record 056).

---

Plaintiff, the medical practitioner to whom Plaintiff made this statement reported that Chireno "denied any intent to harm himself or others at this time. His agitation is restricted to his medication. He does not present as an imminent danger to himself or others at this time." *Id.* at 4349.

Plaintiff emphasizes that his mental health records demonstrate repeatedly that he has no "Episodes of Assaultive Violent Behavior" and no "Current Violence." (MHR 03879, December 5, 2013, assessment; MHR 05353, September 15, 2015, assessment; MHR 06230, July 15, 2021, assessment). The references to violent behavior in his history relate to the murder of his wife in 2008, rather than anything during his decade of incarceration. (MHR 04287).

Finally, Plaintiff argues that forcible medication should not continue absent a updated and more definitive mental health diagnosis that supports his forcible medication, particularly in light of his suspected malingering. Plaintiff's definitive diagnosis is also disputed. In their opposition brief, Medical Defendants Riley and Lieberman contends that Plaintiff was diagnosed with Schizoaffective Disorder while hospitalized at Ann Klein Forensic Center prior to sentencing for his wife's murder; they do not, however, provide any mental health records from Ann Klein to substantiate this diagnosis or explain whether that diagnosis is consistent with his 2014 evaluation.[8] Plaintiff acknowledges that he underwent objective psychological testing in September 2014 for purposes of providing his practitioners with a comprehensive picture of his mental health status and applicable diagnoses. (MHR 03177). Plaintiff argues, however, that the results of these tests were inconclusive, as they did not "negate the presence of genuine mental illness," and also supported "a malingering diagnosis." (MHR 03183). The examiner opined that "his provisional diagnosis of psychotic disorder NOS cannot be confirmed or refuted by current testing due to the invalidity of test results." (MHR 03183). The doctor nevertheless concluded that based on reports of psychotic behavior from childhood and vague references to

---

[8] In their briefing, the Medical Defendants contend cryptically that "Dr. Lieberman's and Dr. Riley's Certifications are based, in part, on their review of portions of Plaintiff's medical records that were not produced by Plaintiff in support of his motion[,]" but they do not explain why they did not cite to these medical records in their respective certifications and have not provided them to the Court.
.

bizarre behavior, the diagnosis of psychotic disorder NOS was reasonable, even after being adjusted to reflect Mr. Chireno's malingering. (MHR03183). Plaintiff contends that in the 7 plus years since this 2014 exam, no further comprehensive exam of its nature has been conducted.[9] Moreover, prison officials have continued to rely upon this examination as suitable grounds for continuing the forcible administration of psychotropic medication.

The Court finds that Plaintiff has raised serious allegations that his Mental Health Records do not support continued forcible medication, and that the prescribing doctor and the Treatment Review Committee members are continuing the forcible medication without conducting an independent review or exercising independent judgment, as required by *Harper*. Although New Jersey's regulations pass constitutional muster, the rubberstamping of Plaintiff's forcible medication would violate Plaintiff's substantive due process rights under *Harper*. In *Sullivan v. Flannigan*, 8 F.3d 591 (7th Cir. 1993), for example, the Seventh Circuit granted summary judgment to prison officials, because the reviewing doctor conducted a "thorough and well-reasoned" review and "exercised his independent judgment" in continuing Sullivan's forcible medication. *Id.* at 598. The court noted however, that "[i]f the approvals of the review committee or medical director appeared to be a rubber stamp of the treating doctor's diagnosis, we would have a different case." *Id.*

To prevail on a motion for preliminary injunction, Plaintiff must first show a likelihood of success on the merits. *Winter*, 555 U.S. at 20. With respect to the merits, the critical issues are largely disputed and cannot be resolved on the present record. In particular, the issues of

---

[9] The State Defendants claim that additional comprehensive examinations were conducted on November 7, 2018 and again on July 16, 2021. (*See* Df. State Opp. At 17 citing MRH 0428, 6229), but neither appears comprehensive.

whether the prescribing doctor and Treatment Review Committee have conducted an independent review and have exercised their independent judgment in continuing Plaintiff's forcible medication are central to Plaintiff's substantive due process claim, and those issues cannot be decided without additional discovery, including the depositions of the treating physician, and the Treatment Review Committee members who have conducted the reviews. Moreover, Plaintiff's current mental health status is also disputed. In light of the serious rights at stake, the Court will defer resolution of the motion for a preliminary injunction, extend the appointment of counsel, and authorize additional expedited discovery on the following issues: 1) whether the prescribing doctor has exercised independent professional judgment in determining a) that Plaintiff is a _currently_ a danger to himself and others and b) that forcibly medicating Plaintiff is _currently_ in his medical interest (independent of institutional concerns); 2) whether the reviewing decisionmakers on the Treatment Review Committee have exercised impartial and independent judgment in approving the continued use of forcible medication on the basis of Plaintiff's dangerousness and his medical interest; and 3) whether Plaintiff has been afforded the opportunity to argue capably before the review committee that he does not need forced medication.[10] Because Plaintiff's current mental state is the relevant one for determining whether he should continue to be forcibly medicated, the Court will also authorize the appointment and payment of experts witness(es) to evaluate Plaintiff and render an opinion as to whether he currently needs psychotropic medication.[11] Discovery, including its scope and

---

[10] The Court need not resolve whether Plaintiff received this procedural protection until the conclusion of discovery, and if Plaintiff prevails on his motion for preliminary injunctive relief and the forcible medication is discontinued, this issue may become moot.

[11] Although Plaintiff's IFP status alone does not authorize the appointing or payment of expert fees in a civil case, federal courts have the authority to appoint and pay the costs of neutral expert witnesses and technical advisors pursuant to Federal Rule of Evidence 706 and the

length, shall be managed by the Magistrate Judge. Once discovery is completed, the Court will reinstate the motion, direct supplemental briefing, and hold a hearing, if necessary, to resolve motion for preliminary injunction.

For the reasons explained above, the Court defers decision on the motion for preliminary injunction, continues Plaintiff's appointment of counsel, and authorizes discovery, including the appointment and payment of expert witnesses, on the relevant factual and legal issues as described above. The Court will direct the Clerk of the Court to administratively terminate the motion for preliminary injunction until the completion of discovery. At the conclusion of discovery, the Court will reinstate the motion, direct supplemental briefing, and hold a hearing, if needed, to resolve the preliminary injunction motion.

**IT IS THEREFORE**, on this  4th  day of October 2022,

**ORDERED** that the Court defers decision on the motion for preliminary injunction; and it is further

**ORDERED** that the Court authorizes discovery, including the appointment and payment of expert witnesses, on the relevant legal and factual issues described herein; and it is further

**ORDERED** that Plaintiff's appointment of counsel is extended through discovery and the resolution of the preliminary injunction motion; and it is further

**ORDERED** that the scope and length of discovery shall be managed by the Magistrate Judge; and it is further

---

inherent authority of the courts. *See* Fed. R. Civ. P. 706. As such, Plaintiff's appointed counsel may submit their proposed expert to the Court for approval.

**ORDERED** that the Clerk of the Court is directed to ADMINISTRATIVELY TERMINATE the motion for preliminary injunction (ECF No. 66) for docket management purposes pending the completion of discovery; and it is further

**ORDERED** that at the completion of discovery the Court will reinstate the motion for preliminary injunction, direct supplemental briefing, and hold a hearing, if needed, to resolve the preliminary injunction motion.

*s/Freda L. Wolfson*
Freda L. Wolfson
U.S. Chief District Judge
